UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM ANDERSON,<br><br>Plaintiff,<br><br>-against-<br><br>VEONEER, INC., JAN CARLSON, ROBERT W. ALSPAUGH, MARY LOUISE CUMMINGS, MARK DURCAN, JAMES M. RINGLER, KAZUHIKO SAKAMOTO, JONAS SYNNERGREN, and WOLFGANG ZIEBART,<br><br>Defendants. | Case No.: _____<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff William Anderson ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against Veoneer, Inc. ("Veoneer" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Veoneer, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition of Veoneer by QUALCOMM Incorporated ("Qualcomm") and SSW HoldCo LP ("SSW HoldCo") (together, the "Acquiring Parties"). SSW HoldCo is a subsidiary of

1

SSW Investors LP ("SSW Investors"). Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under Delaware law.

2. On October 4, 2021, Veoneer entered into an Agreement and Plan of Merger with Qualcomm, SSW HoldCo, and SSW Merger Sub Corp ("Merger Sub"), a direct, wholly owned subsidiary of SSW HoldCo ("Merger Agreement"), whereby each share of the Company will be converted into the right to receive $37.00 in cash per share ("Merger Consideration").

3. Pursuant to the terms of the Merger Agreement, Merger Sub will merge with and into Veoneer, with Veoneer surviving as a direct, wholly owned subsidiary of SSW HoldCo ("Proposed Transaction").

4. On October 26, 2021, in order to convince Veoneer shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement ("Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for Veoneer; (ii) the financial analyses performed by Veoneer's financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley") and Rothschild & Co US Inc. ("Rothschild"), in connection with the Proposed Transaction; and (iii) potential conflicts of interest for Morgan Stanley.

6. The Proposed Transaction is expected to close in 2022, so the special meeting of the Company's shareholders to vote on the Proposed Transaction is imminent ("Shareholder Vote"). Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote, so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed herein is disclosed to Veoneer shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316

10. Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391 because Defendants are found in or inhabit or transact business in this District. Indeed, Veoneer common stock trades on the New York Stock Exchange ("NYSE"), which is

headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Further, the Company's proxy solicitor in connection with the Proposed Transaction, Georgeson LLC is located in this District at 1290 Sixth Avenue, New York, NY 10104. Moreover, Veoneer's U.S. legal counsel for the Proposed Transaction, Skadden, Arps, Slate, Meagher & Flom LLP is located in this District at One Manhattan West, New York, NY 10001.

**PARTIES**

11. Plaintiff is, and has been at all relevant times, a holder of Veoneer common stock.

12. Defendant Veoneer is a public company incorporated under the laws of Delaware with principal executive offices in Stockholm, Sweden. As mentioned above, the Company's common stock trades on the NYSE under the ticker symbol "VNE."

13. Individual Defendant Jan Carlson is, and has been at all relevant times, Veoneer's President, Chief Executive Officer, and Chairman of the Board.

14. Individual Defendant Robert W. Alspaugh is, and has been at all relevant times, a director of Veoneer.

15. Individual Defendant Mary Louise Cummings is, and has been at all relevant times, a director of Veoneer.

16. Individual Defendant Mark Durcan is, and has been at all relevant times, a director of Veoneer.

17. Individual Defendant James M. Ringler is, and has been at all relevant times, a director of Veoneer.

18. Individual Defendant Kazuhiko Sakamoto is, and has been at all relevant times, a director of Veoneer.

19. Individual Defendant Jonas Synnergren is, and has been at all relevant times, a director of Veoneer.

20. Individual Defendant Wolfgang Ziebart is, and has been at all relevant times, a director of Veoneer.

21. The Individual Defendants referred to in ¶¶ 13-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board," and together with Veoneer, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.  Background of Veoneer, Qualcomm, SSW Investors, and the Proposed Transaction**

22. Veoneer designs, develops, and manufactures state-of-the-art software and hardware technologies used for vehicle occupant protection, advanced driving assistance systems, and automated driving solutions. These technologies include vision systems, radar, lidar, thermal sensing, electronic controls, and human-machine interfaces. The Company has approximately 7,500 employees in North America, Europe, China, and India.

23. Qualcomm is a publicly-traded company that engages in the development and commercialization of foundational technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment, consumer electronic devices, and other connected devices worldwide. It operates through three segments: Qualcomm CDMA Technologies (QCT); Qualcomm Technology Licensing (QTL); and Qualcomm Strategic Initiatives (QSI). The QCT segment develops and supplies integrated circuits and system software based on 3G/4G/5G and other technologies for use in wireless voice and data communications, networking, application processing, multimedia, and global positioning system products. The QTL segment grants licenses or provides rights to use portions of its intellectual property portfolio, which include various patent rights useful in the manufacture and sale of

5

wireless products comprising products implementing CDMA2000, WCDMA, CDMA TDD, LTE, and/or 5G standards and their derivatives. The QSI segment invests in early-stage companies in various industries, including artificial intelligence, automotive, digital healthcare, enterprise, IoT, mobile and networking and investment for supporting the design and introduction of new products and services for voice and data communications, and new industry segments. Qualcomm also provides development, and other services and related products to U.S government agencies and their contractors.

24. SSW Investors is a limited partnership based in New York that invests in high-quality businesses and collaborates with partners to create enduring value for all stakeholders.

25. On October 4, 2021, Veoneer, Qualcomm, and SSW Investors issued a press release announcing the Proposed Transaction, which stated in relevant part:

**Qualcomm and SSW Partners Reach Definitive Agreement to Acquire Veoneer**

San Diego, New York and Stockholm, October 4, 2021 - Qualcomm Incorporated (NASDAQ: QCOM) and SSW Partners, a New York-based investment partnership ("SSW Partners"), today announced they have reached a definitive agreement to acquire Veoneer, Inc. (NYSE: VNE; SSE: VNE SDB) for $37.00 per share in an all-cash transaction, representing a total equity value for Veoneer of $4.5 billion. Veoneer has terminated its prior acquisition agreement with Magna International Inc. ("Magna") and canceled its October 19, 2021 special meeting that was previously scheduled to approve that agreement.

At closing, SSW Partners will acquire all of the outstanding capital stock of Veoneer, shortly after which it will sell the Arriver business to Qualcomm and retain Veoneer's Tier-1 supplier businesses. SSW Partners will lead the process of finding strong, long-term strategic partners. This transaction structure facilitates the long-term success of all Veoneer's businesses.

Having already demonstrated a successful partnership with Arriver, Qualcomm believes that the Arriver business will thrive at Qualcomm. Upon close of the transactions, Qualcomm will incorporate Arriver's Computer Vision, Drive Policy and Driver Assistance assets into its leading Snapdragon Ride™ Advanced Driver Assistance Systems (ADAS) solution. This will augment Qualcomm's ability to deliver an open and competitive ADAS platform for automakers and Tier-1s at scale.

SSW Partners will work with Veoneer's management to ensure the pursuit of Veoneer's existing business plan and to identify strong, long-term strategic partners for the Restraint Control Systems (RCS) and Active Safety businesses. The principals of SSW Partners have substantial investing, operating and transaction experience internationally, as well as a track record of success in collaborating with management teams in multiple geographies and industries. They are experienced investors and advisors in both Europe and the automotive sector and will prioritize the smooth continuation of business activities for the customers and employees of the RCS and Active Safety businesses. SSW Partners' investment in Veoneer will represent its first capital commitment as a partnership since its founding at the beginning of the year.

"Qualcomm is the natural owner of Arriver. By integrating these assets, Qualcomm accelerates its ability to deliver a leading and horizontal ADAS solution as part of its digital chassis platform," said Cristiano Amon, president and CEO of Qualcomm Incorporated. "We believe that this transaction and structure benefits both Qualcomm's and Veoneer's shareholders, positions all of Veoneer's businesses for success and provides a compelling opportunity to customers and employees."

"This transaction creates superior value for our shareholders," said Jan Carlson, Chairman, President and CEO of Veoneer. "It also provides attractive opportunities to our Arriver team at Qualcomm and allows our other businesses to find long-term industrial partners where they can continue to develop."

Mr. Carlson continued, "Our board and management team remain focused on delivering on our objectives, driving continuous improvements across the organization and launching new technologies and programs for our customers. Despite significant industry-wide challenges, our team has done an outstanding job positioning Veoneer for success, building on our leading ecosystem of partners, cutting-edge technology and a strong order book."

"We are excited to partner with Qualcomm to acquire Veoneer," said Antonio Weiss and Josh Steiner of SSW Partners. "While Qualcomm focuses on the Arriver business, we will focus on finding strong, long-term strategic homes for the rest of Veoneer's businesses – we are committed to ensuring that Veoneer's employees prosper, the businesses continue to innovate and grow and customers continue to have uninterrupted access to the outstanding service and quality for which Veoneer is known. We have high regard for Veoneer's management team and look forward to partnering with them to ensure a successful outcome for all stakeholders."

**Transaction Details**

The cash purchase price of $37.00 per share represents an 18% premium to Veoneer's prior agreement with Magna, and an 86% premium to the unaffected share price prior to the announcement of the Magna agreement. The transaction has been approved by the boards of directors of Qualcomm and Veoneer and is subject to regulatory approvals including under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 in the United States, certain European foreign direct investment approvals, approval by Veoneer stockholders and other customary conditions. The transaction is expected to close in 2022.

The announcement follows the Veoneer board's determination, with the assistance of its financial and legal advisors, that a formal acquisition offer Veoneer received from Qualcomm and SSW Partners on October 1, 2021 constitutes a "Superior Proposal" under the terms of Veoneer's merger agreement with Magna dated July 22, 2021. Magna has waived its right to submit a revised proposal to Veoneer.

(Emphasis in original).

## II.   The Proxy Omits Material Information

26.   Defendants filed the materially incomplete and misleading Proxy with the SEC. Yet, the Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. Here, the Proxy misrepresents and/or omits material information that is necessary for Veoneer's shareholders to make an informed decision in connection with the Proposed Transaction at the Shareholder Vote.

27.   First, the Proxy fails to disclose material inputs for the financial projections provided by Veoneer's management (defined in the Proxy as the "Company Projections"). In footnote two of the Company Projections, it states that EBITDA was calculated by adding operating income to depreciation and amortization. However, while the Proxy discloses the inputs for operating income, it fails to provide the inputs for depreciation and amortization. Indeed, Veoneer's shareholders are entitled to this information, so they can properly evaluate management's derivation of the Company Projections, prior to the Shareholder Vote.

28.   Thus, by disclosing the inputs for certain metrics in the Company Projections and withholding others, Defendants have rendered the Company Projections materially incomplete and therefore misleading. Unlike poker, where a player's unexposed cards may be concealed, the object of a proxy statement is to put all of one's cards on the table face-up. In this case, only some of Defendants' cards were exposed—the others were concealed. With regard to future events,

uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).

29. Second, the Proxy omits material information concerning the financial analyses performed by Morgan Stanley and Rothschild.

Morgan Stanley's Financial Analyses

30. For Morgan Stanley's *Public Trading Comparables Analysis*, the Proxy does not disclose the individual multiples observed for each of the selected comparable companies. Further, the Proxy omits the number of outstanding shares of Veoneer common stock on a fully diluted basis, as well as the Company's estimated net debt. Additionally, while the Proxy provides the minimum and maximum multiples observed, it fails to disclose the median multiples.

31. In addition, for Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the inputs underlying the capital asset pricing model used to derive the discount rate ranging from 10.4% to 11.9%; (ii) the inputs and assumptions underlying the perpetuity growth rates of 1.5% to 2.5%; and (iii) the inputs underpinning financial leases, tax-effected pension liability, cash and cash equivalent, and investment in associates (each of which was used to calculate total debt).

32. The foregoing key inputs are material to the Company's shareholders, and their omission renders the summary of Morgan Stanley's *Discounted Cash Flow Analysis* incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts and then makes several key choices, "each of which can significantly affect the final valuation." Steven Davidoff, *Fairness*

*Opinions*, 55 Am. U. L. Rev. 1557, 1576 (2006). These choices include "the appropriate discount rate, and the terminal value . . . ." *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).

33. Without the aforementioned, the Company's shareholders cannot evaluate the reliability of Morgan Stanley's *Discounted Cash Flow Analysis* for themselves, and cannot meaningfully determine whether the implied equity value ranges prepared by Morgan Stanley reflect Veoneer's true value or are instead the result of unreasonable judgments by Morgan Stanley.

34. With respect to the *Precedent Transactions Multiples Analysis*, the Proxy provides that Morgan Stanley selected representative ranges of the aggregate value to the estimated LTM sales of the comparable transactions, yet it does not disclose what those representative ranges were. Further, the Proxy provides the minimum and maximum multiples observed, but fails to disclose the respective median multiples observed.

35. Lastly, the *Equity Research Analysts' Future Price Targets* Analysis does not disclose the source of the analysts observed and their respective price targets posted for Veoneer.

Rothschild's Financial Analyses

36. For Rothschild's *Selected Public Company Analysis*, the Proxy fails to disclose Veoneer's net debt as of June 30, 2021, and the number of fully diluted shares of Veoneer common stock as of September 30, 2021. Additionally, the analysis references Rothschild's use of Broker Consensus and Management Projections, yet these terms are not defined or mentioned anywhere else in the Proxy. If the Management Projections are the same as the Company Projections then this should be clarified, but if they are different, then the Management Projections must be disclosed. To that same effect, the Proxy must also define the Broker Consensus.

37. Finally, with regard to Rothschild's *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the estimated terminal value of Veoneer; (ii) the inputs underpinning the capital asset pricing model used to derive the range of illustrative discount rates of 10.5% to 12.5%; and (iii) the inputs and assumptions underlying selection of the illustrative range of growth rates in perpetuity of 1.5% to 2.5%. The materiality of the inputs used by investment bankers in performing a Discounted Cash Flow Analysis is discussed in detail above.

38. Third, the Proxy omits information concerning potential conflicts of interest for Morgan Stanley in connection with the Proposed Transaction.

39. To start, the Proxy provides that Morgan Stanley rendered financing services to Qualcomm in the two years prior to the Proposed Transaction and received aggregate fees of less than $1 million as a result, yet the Proxy fails to disclose the specific services Morgan Stanley rendered to warrant those fees.

40. Similarly, the Proxy states that Morgan Stanley rendered financial advisory and financing services to Veoneer and received aggregate fees of approximately $5 to $15 million for such services. However, the Proxy does not disclose the specific services Morgan Stanley

rendered to Veoneer and the corresponding fees obtained for each service.

41. Indeed, information that bears on whether an investment bank faces conflicts of interest are material to stockholders when deciding how to vote on a merger, because stockholders must be able to understand what factors might influence the advisor's actions. All factors that may entice a financial advisor to favor a particular transaction—including relationships and/or prior or future compensation—must be fully disclosed, as is no different in this case.

42. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to cast an informed vote on the Proposed Transaction, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act)**

43. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

44. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

45. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

46.     The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

47.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the Company Projections; (ii) the financial analyses performed by Morgan Stanley and Rothschild; and (iii) potential conflicts of interest for Morgan Stanley.

48.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

49.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Veoneer's financial advisors reviewed and

discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by the advisors, as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the financial advisors' analyses in connection with their receipt of the fairness opinions, question the financial advisors as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions.

50.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

51.     Veoneer is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

52.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who

will be deprived of his right to cast an informed vote on the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

53. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54. The Individual Defendants acted as controlling persons of Veoneer within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

55. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and is therefore presumed to have had

the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

57. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

60. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

**(Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure)**

61. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62. By virtue of their role as directors and/or officers of the Company, the Individual

Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

63. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

64. The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

65. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 5, 2021          **MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*